IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 28, 2018

## STATE OF TENNESSEE v. JAMES RAY PARKER

**Appeal from the Circuit Court for Monroe County**
**No. 14231     Sandra Donaghy, Judge**

---

### No. E2017-01787-CCA-R3-CD

---

The defendant, James Ray Parker, appeals his Monroe County Circuit Court jury conviction of first degree murder, claiming that the trial court erred by concluding that the defendant was competent to stand trial, that the trial court erred by denying the defendant's motion to suppress his statements to the police and the fruits derived from those statements, that the trial court erred by failing to suppress evidence obtained via an invalid search warrant, that the trial court erred by failing to grant his motion to continue, that the trial court erred by refusing to instruct the jury on the defense of insanity, and that the evidence was insufficient to support his conviction. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Leah Sauceman, Athens, Tennessee (on appeal); and James H. Stutts, Sweetwater, Tennessee (at trial), for the appellant, James Ray Parker.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Shari Tayloe, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Monroe County Grand Jury charged the defendant with first degree premediated murder for the October 13, 2013 death of his great aunt, Kathy Bookout.

At the defendant's February 2017 trial, the victim's husband, Carl Bookout, testified that in October 2013, he and the victim lived together in Madisonville,

Tennessee, and that the defendant is the victim's great-nephew. The defendant was a frequent visitor to their home, and, in December 2012, Mr. Bookout and the victim had allowed the defendant to live with them for approximately one month to help the defendant get back on his feet.

Mr. Bookout testified that in early October 2013, someone broke into his residence and stole an old rifle. He did not report the theft to the police until after speaking with his brother-in-law, J.D. McJunkin, at the victim's funeral.

Mr. Bookout recalled that on October 12, 2013, he cut the hay in his field and mowed his yard before attending a birthday party for his brother. Mr. Bookout did not share a bedroom with the victim because he generally worked the 7:00 p.m. to 7:00 a.m. shift at work. Mr. Bookout did not work on the evening of October 12, 2013, and, as was often the case given his work schedule, he had difficulty getting to sleep that night, so the victim gave him an Ambien to help him sleep. When he woke the following morning, he went to wake the victim so that she could mend a pair of pants for him. When he walked into the victim's bedroom, he "noticed her leg was laying off the bed," and when he called her name, she did not respond. He "reached down to shake her," and he "realized she's cold." Mr. Bookout ran from the house and telephoned his daughters, Tasha and Carla.

Both women arrived shortly thereafter and went into the victim's bedroom. Mr. Bookout's daughter, Carla, telephoned 9-1-1, and the family went onto the porch to await the arrival of police. After the members of the rescue squad and sheriff's department arrived, officers asked the family to step into the yard. As they stood in the yard, Mr. Bookout's brother-in-law noticed "a hole, just like a perfect circle in the window" of the victim's bedroom. Mr. Bookout also observed an orange BIC lighter in the grass at the edge of the yard, and he knew that it had not been there the day before when he had mowed.

The victim's daughter, Kimberly Tasha Walton, testified that when questioned by the police at the scene, she suggested that the defendant might have murdered the victim. Ms. Walton explained that, a few days before the murder, she had telephoned 9-1-1 and told the operator that the defendant "had supposedly been beating up his mom" and that the defendant "was crazy, because his mom always said he was crazy." Ms. Walton clarified that she had not witnessed any altercation between the defendant and his mother but that she overheard the defendant's mother telling the victim "what he was doing." Ms. Walton said that she thought the defendant might have believed that the victim "was the one that called the law" and that that belief might have prompted him to harm the victim.

-2-

Monroe County Sheriff's Office ("MCSO") Detective Tonia Norwood was the lead investigator in the defendant's case. Detective Norwood testified that, among her myriad duties in the case, she collected an orange BIC lighter discovered by members of the victim's family. In addition, Detective Norwood observed that "a perfectly round circle" had been broken in the window in the victim's bedroom, which Detective Norwood described as unusual, noting that "the muzzle from a blast will" typically cause a window to shatter. She recalled that all the glass from the break was inside the room and that the blinds on the window appeared to have been cut. Detective Norwood and other officers removed "the drywall and the stud and . . . the insulation" surrounding a bullet hole in the bedroom wall and were able to remove a bullet from inside the insulation.

Detective Norwood obtained and executed a warrant to search the defendant's residence at Plemmons Trailer Park for a rifle and shells. Inside the residence, she "observed the house was . . . in disarray. There was stuff throwed everywhere. There was holes punched in the walls. Things were broken, garbage on the floor in the kitchen." Officers discovered bullets and a camouflage jacket inside the residence and an all-terrain vehicle ("ATV") and .30-06 rifle outside the residence. The bullets discovered inside the defendant's residence, "half-jacketed, with [a] lead nose," were the same type as the bullet found in the victim's bedroom wall. Officers found the .30-06 rifle inside a culvert in front of the defendant's trailer.

Detective Norwood sent the cigarette lighter, rifle, and bullet to the Tennessee Bureau of Investigation ("TBI") for forensic examination and testing.

The defendant's grandfather and the victim's brother-in-law, Jesse McJunkin, testified that the defendant visited his house often and had lived with him and his wife during his teens. In October 2013, the defendant came to Mr. McJunkin's house "to get his rifle," a double-action .30-06 with a scope, for target practice and "brought an old shotgun with him" that he said Mr. McJunkin could keep. Mr. McJunkin explained that the defendant had "pawned" the rifle to Mr. McJunkin and his late wife approximately one year earlier. Mr. McJunkin recalled that the defendant also got ammunition that "might have been . . . solid copper" or might have been half-jacketed with "a lead tip."

Mr. McJunkin said that the defendant was not behaving peculiarly when he came to swap guns.

MCSO Narcotics Investigator Conway Mason testified that he assisted in the investigation of the victim's murder. Investigator Mason interviewed the defendant at the sheriff's department on October 13, 2013, and attempted to have the defendant

account for his whereabouts on the previous day and evening. Investigator Mason recalled that he provided the defendant with *Miranda* warnings, and the defendant, after indicating that he understood his constitutional rights, agreed to waive them. A video recording of Investigator Mason's interview with the defendant was played for the jury.

Investigator Mason said that after the interview, officers drove the defendant back to his residence. Investigator Mason and other officers then attempted to verify the defendant's account of his activities, and they discovered that the defendant could not account for his whereabouts during the period between 2:00 a.m. and 5:00 a.m. After interviewing the defendant's girlfriend, Ginger Harris, officers interviewed the defendant a second time. A video recording of the second interview was played for the jury.

TBI Special Agent and Criminal Investigator Jason Legg, who was the lead investigator into the victim's murder, testified that his investigation began with a walk-through of the scene, during which Agent Legg observed a "recent disturbance on top of the air conditioner" outside the victim's window. Agent Legg also observed a perfectly round hole in the bedroom window. Using a string stretched from the center of the void in the window to the bullet strike in the bedroom wall, Agent Legg determined the bullet's likely path. Agent Legg testified that, based upon that trajectory, investigators concluded that the victim was "most likely sitting up in bed at the time she was shot."

After learning that the defendant had obtained a .30-06 rifle and half-jacketed ammunition from his grandfather in the days before the victim's murder, Agent Legg went to the sheriff's department to interview the defendant. A video recording of the interview was played for the jury.

During the interview, the defendant admitted having murdered the victim, but he insisted that he had killed the victim in self-defense, stating, "It's an eye for an eye, and she tried to take my life so by God I took hers. I took it. That's just it. And I don't got no remorse whatsoever." The defendant claimed that the victim had poisoned him and told him that she had done so. The alleged poisoning occurred before Christmas of the previous year when the defendant was staying with the victim while he and his mother were having difficulties. He said that the victim prepared "some kind of casserole type deal" and put poison in it that affected his vision and that, after consuming the meal, he "felt like [he] was dying," claiming, "It's just a miracle I lived through it. . . . She thought I was going to die . . . that's where this comes into play." The defendant also claimed that the victim, from whom he had previously obtained pain pills, had been "puttin' stuff in the medicine" and that he knew for a fact that the victim had put "female hormones" into the pills she had given him. The defendant said that the knowledge that the victim had tried to poison him weighed so heavily on his mind that he decided that his

-4-

"life's worth more than" the victim's. Of his decision to kill the victim, the defendant said, "I's thinking she needed to die a long time ago for what she did."

The defendant admitted planning the victim's murder for some time, telling Agent Legg, "I planned her death but not until she planned mine." The defendant said that he obtained the rifle for the purpose of killing the victim and that he practiced shooting into a tree outside his home. The defendant recalled that the aim of the gun was "off," so he had to fix it before using it to shoot the victim. On the night of the murder, the defendant gathered the rifle, ammunition, and a large hunting knife and drove his ATV to the victim's house. Once there, he parked near the edge of the woods. The defendant described what happened next:

> I climbed that hill. I went up there. I took that gun. I knocked the window out. And when she raised up, dude, I just aimed it at her chest. I didn't even scope it or nothing, I just laid it like this to where I knew it was going to point blank her, and I fired that son of a b****. And I hit the road. That's what I did. And here I am.

He added,

> I calculated it to where I knew it was going to go chestwise . . . . It's a vicious assault, dude, it really is, but to take and put somethin' in somebody's food, I think is worse. I would much rather her pointed a gun at my head and shot me as to put poison in somebody's food . . . .

The defendant said that a light and the television were on inside the room, which helped him "to see a little bit." The defendant described the victim as "scared sh**less" and said that after he fired the shot that killed the victim, he "heard her whimper." The defendant claimed that the circumstances of the victim's death were "meant to be," recalling that when he tried to reload the rifle for a second shot at the victim, the gun "wouldn't even take another shell." After shooting the victim, the defendant collected the shell casing and left on his ATV. He told Agent Legg that he stopped at a nearby property and disposed of the casing by "jamm[ing] it in the ground." The defendant said that he had dropped his orange cigarette lighter near the edge of the woods beside the victim's house.

The defendant told Agent Legg that he knew prior to killing the victim that he would likely "do life in the penitentiary or several years for this" and that he might be subject to the death penalty, but he insisted that he felt no remorse for the murder, saying, "I'm hurtin' for myself . . . but I don't feel sorry for her not whatsoever." He added, "It's

hard to acknowledge the fact that I would do something like this but it's even harder to acknowledge that I waited so long." The defendant admitted that he could not recall the last time he had seen or spoken to the victim but nevertheless maintained that the fact of her earlier attempt on his life had led him to commit the murder, musing, "I just don't understand how she could try to take my life acting like it's nothing and . . . me not have done nothing . . . ." The defendant again insisted that he killed the victim because of the earlier poisoning:

> If she can do that to somebody and not be considered as a murderer, then people better lookout, you know what I mean, people had better look out because if somebody won't take a gun to her and her doing sh** like that, by God I will. And I did. And that's just it. Self-defense in my book because I felt, I mean, she told on herself, she really did. And I know I felt like my eyes was drying out . . . I could just feel it man, like it was sucking the life out of me, whatever she put in that sh**.

He added, "If a man ain't gonna take a stand and put that crazy b**** out of her misery rather than watch her put . . . poison in somebody's food and them eat it and them consume it and then it's in your body . . . it just tears me up."

The defendant told Agent Legg that he had hidden the rifle in the "ditch drain" at the Plemmons Trailer park. The defendant provided a detailed description and drew a sketch of the weapon's location.

Chief Medical Examiner for Knox and Anderson Counties, Doctor Darinka Mileusnic-Polchan, performed an autopsy of the victim's body. Doctor Mileusnic-Polchan testified that the cause of the victim's death was a single gunshot wound that entered her chest and exited through her back. She described the path of the bullet as "downward, and then slightly from left to right, and of course, from the back." Doctor Mileusic-Polchan said that the discovery of multiple, tiny bullet fragments around the wound, which she described as "a snow storm pattern," indicated that the bullet was fired from "a high-powered rifle." The bullet "severed the left sub-clavian artery and vein," leading to a "fast bleeding death." Additionally, the bullet fractured five of the victim's ribs and "shred[ded] the left lung." Doctor Mileusnic-Polchan opined that the "tri-sected sub-clavian artery" and the "shredded left lung" would both have caused rapid blood loss resulting in a quick death. She said that the victim could not have survived the gunshot wound even with immediate medical attention.

Following Doctor Mileusnic-Pochan's testimony, the State rested. The

-6-

defendant elected not to testify but chose to present proof.

The defendant's mother, Debbie Torbett, testified on behalf of the defendant. Ms. Torbett, who was also the victim's niece, said that the defendant had lived with his grandparents, girlfriend, and even with the victim at one point. Ms. Torbett said that eventually, the defendant purchased a mobile home for her and moved it to a trailer park in Vonore. Ms. Torbett testified that she lived in the mobile home until she sold it to Ms. Walton. At some point, the defendant bought the mobile home back from Ms. Walton so that he and Ms. Torbett could live in it and that the two of them were living in the mobile home at the time of the victim's murder. At the time of the victim's death, the victim had employed Ms. Torbett to babysit "her oldest daughter's child who has cerebral palsy," and Ms. Torbett often stayed overnight as part of her duties.

Ms. Torbett testified that, approximately five years before the murder, she noticed a drastic change in the defendant's personality. She said that the defendant, who had previously been meticulous about his personal appearance, stopped attending to his personal hygiene. Around the same time, the defendant "started talking about technology, talking to the t.v. He thought the t.v. was talking to him." During some episodes, the defendant spoke in a voice that did not sound like his own and engaged in reckless and self-harming behavior. Following a particularly disturbing event, Ms. Torbett telephoned the victim's daughter, Carla Milsaps, and "told her that [the defendant] knows he's gotta' have some help. He can't go on like this." She asked Ms. Milsaps to drive her and the defendant to the hospital, but she was unable to get the defendant admitted for mental health care. Instead, doctors gave the defendant medication to treat anxiety. Despite the medication, the defendant continued to experience problems with anger and anxiety, which episodes often resulted in the defendant's injuring himself or destroying property. Ms. Torbett recalled a specific episode that occurred approximately five months before the victim's murder. Ms. Torbett passed the defendant walking down the side of Highway 411, and when she asked where he was going, the defendant told her he was going to the jail. When Ms. Torbett returned to the mobile home they shared, she found that the sliding glass doors had been broken, a hammer hung from the front of a large flat screen television, and all the mirrors in the house broken. Additionally, the defendant had "busted in" several occasional tables and several of the windows in the trailer.

Ms. Torbett said that the defendant had spent time as a patient at both Moccasin Bend Mental Health Institute ("Moccasin Bend") and Middle Tennessee Mental Health Institute ("MTMHI"). She added that she had never seen the defendant express any animosity toward the victim.

The defendant's girlfriend, Ginger Harris, testified that she first met the defendant in 2005, and the two eventually became romantically involved. She said that when she first met the defendant, he "was very nice. Hard worker. He was just good to people." The defendant changed, however, and he eventually "got to where he didn't trust anybody" and behaved as though "everybody was after him." The defendant began regularly talking to the television set, both when it was off and when it was on, and he burned his driver's license. The defendant began refusing to eat the food she prepared for him, and, on more than one occasion, he asked her who she was. Ms. Harris recalled that on the day before the murder, she prepared food for the defendant, but he would not eat it. The defendant sat outside the mobile home and drank and talked with his friends about cars. Ms. Harris left the residence shortly before 1:00 a.m.

Forensic Psychologist Doctor Thomas Schacht testified as an expert in forensic psychology. Doctor Schacht said that he had reviewed the records related to the defendant's physical and mental health during his stay at the jail as well as the records of the defendant's previous stays at Moccasin Bend and MTMHI. Doctor Schacht also reviewed the reports generated as a result of the court-ordered forensic examinations of the defendant in this case. He acknowledged, however, that he had been unable "to complete the planned evaluation of [the defendant] with respect to the face to face portion of it." On his first attempt, the interview "never got past the preliminaries" because the defendant asked to return to his cell after only 25 minutes. On the second occasion, "half a dozen Officers . . . in riot gear, some of them" were present in the room with them, so the defendant refused to speak to Doctor Schacht. On the third occasion, which occurred in a staff breakroom at the jail, the defendant "ended that visit prematurely as well, expressing a belief that everything that was happening between us was prewritten and predetermined and being controlled by technological forces that neither one of us had any control over." The last time Doctor Schacht attempted to interview the defendant, the defendant "refused to come out of his cell."

Doctor Schacht said that records of the defendant's incarceration indicated that the defendant "continued to verbalize concerns about his food being contaminated, and it's very difficult for him to eat," resulting in his losing 50 pounds since his arrest. Similarly, during their meeting in the staff breakroom, the defendant told Doctor Schacht that he was hungry and ate a bagged lunch. The defendant said that he was still hungry, but when Doctor Schacht gave him a second bagged lunch, the defendant "suddenly changed his mind" and acted "as if he had just suddenly become disgusted by the idea of food."

Doctor Schacht testified that, in April 2013, the defendant "had an episode of apparent disorganized behavior at home" during which the defendant had broken every mirror in his house along with two big screen televisions and had "shot arrows through

every picture in the house." During that episode, the defendant told his mother not to return to the mobile home "because he was going to burn it down." As a result, the defendant was involuntarily committed into Moccasin Bend due to his "paranoid delusions" and hallucinations accompanied by "safety issues, both suicidal thoughts and homicidal thoughts toward his mother." According to Doctor Schacht, the records of the defendant's treatment following that episode indicated that the defendant "lacked insight. He had no awareness that he was mentally ill, or that he needed treatment. He tried to run away from the hospital. He didn't think he belonged there."

Regarding the victim's murder, Doctor Schacht said that "[t]he best information" available to him came "from [the defendant's] statement to the authorities," and, that, "to any extent that there is a basis for what's called an insanity defense in this case, it would be found in the four corners of that statement." Doctor Schacht said that "from the very beginning and consistently throughout his statement, [the defendant] assert[ed] a belief that his great aunt had poisoned him, with food that had infected him many months earlier." The defendant claimed that the poisoned food "made him feel like he was dying, and that it also changed the way his body looked to him," which Doctor Schacht described as "somatic delusion." Doctor Schacht testified that the defendant's claimed concern that the victim had put "female hormones" into the pills she gave him could have been "at least thematically . . . related to the prior history of having been sexually assaulted in jail."

Doctor Schacht opined that, although the defendant "suffered from a mental disorder whose most relevant symptom was delusional beliefs," it "was very clear" that the defendant "understood the nature of his action." Doctor Schacht explained, "If wrongfulness is understood as knowledge that something is against the law, then from that perspective it's quite clear that [the defendant] did know that what he was doing was against the law." He added, "If on the other hand wrongfulness is understood as appreciation of the morality of an action, then there is reason to question that appreciation in this case." Doctor Schacht explained that the defendant did not believe himself to be guilty of murder because he believed he was acting in self-defense against someone who was trying to poison him. Doctor Schacht did not believe that the defendant's mental disease affected his ability to act intentionally or knowingly, saying, "[H]e knew what his action was. He did not have a realistic or rational appreciation of the circumstances in which he was acting."

During cross-examination, Doctor Schacht testified that he was unable to interview the defendant because the defendant either refused to meet with him entirely or ended the meeting "without us ever getting into the issue of his recollections and his experience of the events surrounding the offense." Doctor Schacht did not interview any of the defendant's family members.

Based upon this proof, the jury convicted the defendant as charged of first degree premeditated murder. The trial court imposed a sentence of life imprisonment.

In this timely appeal, the defendant challenges the trial court's finding that he was competent to stand trial, the trial court's denial of his motions to suppress his pretrial statements to the police as well as the evidence obtained via the search warrant, the trial court's denial of his motion for a continuance, the trial court's refusal to instruct the jury on the defense of insanity, and the sufficiency of the convicting evidence.

## I.       Competence

The defendant first asserts that the trial court erred by determining that he was competent to stand trial. The State contends that the trial court did not err, noting that none of the doctors who examined the defendant had deemed him incompetent.

The defendant underwent more than one examination to determine his competence to stand trial. In December 2013, Doctor Andrew H. Demick informed the trial court that he needed more time to evaluate the defendant to determine whether he was competent, observing that, although the defendant "appears intellectually capable of assisting with [h]is own defense, his current level of exhaustion, his depressed mood, and some inconsistency in his responses" necessitated further testing. In a February 2014 follow-up letter, Doctor Demick informed the court that the defendant was "demonstrating that he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, as well as having a rational and factual understanding of the proceedings against him." Doctor Demick concluded that the defendant had "a basic enough understanding of the nature of the legal process, the charges against him and the consequences that may follow" and that, despite being "distrustful and challenging to work with," the defendant was "capable of consulting with counsel and participating in his own defense."

Following the trial court's grant of ex parte funds for a forensic evaluation, Doctor Schacht attempted to evaluate the defendant for competency and to determine whether a defense of insanity could be supported. In his June 2015 report, Doctor Schacht opined that the defendant was "severely mentally ill and not presently competent to stand trial." Doctor Schacht stated that he had reviewed Doctor Demick's report but "could not inquire further into the issues raised by [the] report because of [the defendant's] severe limitations in present capacity to participate in a rational and coherent conversation."

In September 2015, Doctor Demick suggested that the defendant might no

longer be competent, noting that the defendant had refused to respond to any of the items or questions during a forensic examination and that he could not determine whether the defendant's refusal to answer was "due to defiance, malingering of mental health difficulties, or severe mental illness." Based upon these concerns, the trial court ordered the defendant to undergo another forensic examination at MTMHI. The report generated by MTMHI following the September 2015 evaluation indicates that the defendant was competent to stand trial at that time.

At the March 24, 2016 hearing to determine whether the defendant was competent to stand trial, Doctor Schacht testified that he had reviewed the defendant's mental health records as well as the records of his stay at the jail along with "whatever prosecution disclosure" was available. Doctor Schacht said that he attempted to interview the defendant on April 25, 2015, but "[i]t was really not possible to have a meaningful interview with [the defendant] at that time" because the defendant, according to Doctor Schacht, "could not participate in a meaningful conversation, or he did not participate in one." Doctor Schacht recalled that the defendant appeared unable to follow the doctor's questions and seemed to be distracted and, at one point, pointed to his forehead and indicated that he was suffering from "a brain pain." The defendant nodded affirmatively when asked "if he felt like there was something wrong with his brain." Doctor Schacht testified that when he asked the defendant what he had eaten for breakfast, the defendant did not respond but "tears were flowing down his cheeks." The defendant continued to cry and refused to answer any questions during the remainder of the interview. When Doctor Schacht got up to leave, the defendant "offered none of the ordinary social behaviors that are appropriate to a separation."

Doctor Schacht testified that, as part of his evaluation, he spoke with a Nurse Beard at the Blount County jail, whom he described as the staff nurse who had interacted with the defendant since 2014. According to Doctor Schacht, Nurse Beard indicated to him that the defendant did not ask to be seen by medical personnel during the time he was incarcerated in Blount County. The defendant did allow Nurse Beard to take his vital signs and perform a cursory physical examination, but he refused a skin test for tuberculosis and refused to cooperate with a routine physical examination conducted just before the evaluation. The defendant "refused all medications with a persistent explanation of a belief that he was being poisoned" and apparently told Nurse Beard that "a previous nurse somewhere had tried to poison him." Nurse Beard told Doctor Schacht that her "attempts to obtain history failed because everything went in circles, returning back to themes of being poisoned."

Based upon this interview and his review of all pertinent records, Doctor Schacht concluded that the defendant was severely mentally ill and not competent to stand trial. Doctor Schacht noted that, during the defendant's hospitalization in Moccasin

Bend prior to the murder, the defendant exhibited "chronic symptoms of [a] severe nature that included cognitive impairment, included psychotic symptoms, such as hallucinations and delusions, and that also included behavioral dyscontrol -- aggression in particular." Doctor Schacht observed that of particular concern following the April 2013 hospitalization was the defendant's lack of insight with regard to his own mental illness, which the doctor described as "common in individuals with a schizophrenic form disorder," because it creates "a high risk, if the patient is left to their own devices, that they will discontinue treatment." Doctor Schacht determined that the defendant was not competent largely because "[h]e simply couldn't have a conversation. Even about ordinary everyday things." He stated that the defendant "had a mental illness that was a sufficient explanation for the defendant's inability to communicate" that "existed in the record" before the offense.

During cross-examination, Doctor Schacht concluded that the defendant did not answer his questions during their interview because he was not capable of doing so. He based this conclusion on the defendant's "record of a mental illness consistent with this kind of behavior" and "the history of a year in the jail behaving in a very similar way" in a variety of situations. Doctor Schacht said that he "could not assess [the defendant's] factual understanding" of the ideas relevant to competency because the defendant would not talk to him. Doctor Schacht added that he had concerns about the defendant's "capacity to be rational" given the defendant's "failure to speak . . . even about things unrelated or only tangentially related" to the criminal case. He said that, based upon the defendant's inability to communicate with him or "with treating clinicians in the jail, as described by the nurse," he concluded that the defendant was not operating at "a level of functioning that's compatible with consulting with your Attorney."

During re-direct examination, Doctor Schacht explained that he attempted to interview the defendant on the day of the hearing but was thwarted by correctional officers at the Knox County Detention Center who "were unwilling" to allow him a private interview with the defendant. During this encounter, the defendant remained focused on the officers' presence rather than the doctor's questions. After a short period of time, the defendant told Doctor Schacht that he was not going to speak to him because he was "taking the 5th."

Doctor David Scott Crawford, the attending psychiatrist for the Forensic Services Program at MTMHI testified that the defendant spent three weeks at MTMHI in November 2015 for a court-ordered forensic evaluation. Doctor Crawford, who performed a psychiatric evaluation, testified that the defendant knew why he was at the facility, that he was aware of the nature of the charge against him, and that he was aware of the potential punishment for his offense. The defendant told the doctor that he had been charged with murder because he "'supposedly shot a lady that's my Aunt.'" During

the examination, the defendant occasionally refused to answer, claimed lack of memory, or gave evasive answers, but, when pushed, the defendant often gave correct answers.

Doctor Crawford testified that the defendant's examinations proved inconsistent because he would claim to Doctor Crawford that he could not remember or did not know certain information only to relay the information later either to another person or to Doctor Crawford after further inquiry. By way of example, Doctor Crawford recalled that on one occasion, the defendant said that he knew that 12 jurors would be needed to convict him and then, two days later, claimed that he did not know how many people comprised a jury. Doctor Crawford noted that the defendant's initial answer to most questions was "I don't know," even when he did know, indicating that "he was choosing not to cooperate" and that his refusal to answer "wasn't based on his real ability to answer the question." Doctor Crawford said that the defendant was eventually able to identify all the actors in a criminal trial, to identify the charged offense and potential penalty, and to describe the process. Although the defendant "shut down and wasn't willing to talk to the Psychologist" about disclosing information to his attorney, "he certainly answered a lot of questions demonstrating that he is competent or capable of learning what he needs to know." Doctor Crawford explained, "[I]t just became apparent that his refusal to answer, or saying I don't know the answer, did not in any way indicate that he wasn't capable of answering or didn't understand the question or know the answer to it."

Doctor Crawford testified that the defendant scored very high on a test designed to identify whether someone was malingering. He stated, however, that regardless of malingering, "the fact . . . that he's not being consistent in his answers is more the issue today as far as whether he's competent." Doctor Crawford opined that the defendant's malingering was relevant to the competency determination because "it was just one other area that confirmed that he was not always being forthright in his answers."

At one point, the defendant complained that he could not complete paperwork because his vision was blurry, so he was examined by a physician, and a CAT scan was done. The visual examination established he had 20/20 vision, and the CAT scan did not establish any reason for the blurred vision.

Doctor Crawford, who had reviewed all the defendant's mental health records from his previous hospitalization, his previous evaluations, and his stay in the jail, stated that nothing in any of the defendant's mental health records indicated that the defendant was incompetent. Doctor Crawford observed that "[t]here was a lot to indicate that he was not cooperative, and it would be difficult for the evaluators that were seeing him when he wasn't cooperating to necessarily know if it was volitional, on purpose, or whether he was not cooperating because he wasn't competent." Doctor Crawford

-13-

affirmed that the defendant suffered from a mental illness but concluded that the defendant's mental illness did not render him incompetent.

During cross-examination, Doctor Crawford testified that he was involved in treating the defendant during the defendant's April 2013 stay at Moccasin Bend. Doctor Crawford said that he diagnosed the defendant with schizophrenic form disorder, which "means that the patient had symptoms similar to schizophrenia, but it has not yet been a chronic illness of six months or more which would meet the criteria for schizophrenia." He said that when he later treated the defendant at MTMHI, he diagnosed the defendant with schizoaffective disorder, which "has some mood component" as compared with schizophrenic form disorder.

At the conclusion of the hearing, the trial court found that there could be no question that the defendant suffered from a mental illness. The court observed that while Doctor Schacht had an unproductive 25-minute interview on which to base his conclusions, Doctor Crawford's evaluation was comprised of "a team of forensic evaluators evaluating his condition for a twenty-one-day period." The trial court noted that Doctor Crawford's testing established that the defendant was likely malingering and that the defendant's interactions with the evaluators established that the defendant was providing inconsistent answers as part of "a choice not to cooperate." The trial court observed that forensic evaluations performed by both Moccasin Bend and MTMHI resulted in clinical conclusions that the defendant was competent. The trial court found that the defendant's exercise of his Fifth Amendment right to remain silent when questioned by Doctor Schacht "shows . . . that he understands and appreciates the constitutional rights . . . and that he was able to meaningfully exercise them today." Finally, the court concluded that although the defendant's "mental illness will have an impact on the case . . . the [d]efense has not proven that this [d]efendant is incompeten[t] to a burden of preponderance of the evidence." The court ruled that the defendant was competent to stand trial.

Given the ongoing concerns related to the defendant's competency, the trial court ordered yet another forensic evaluation in January 2017. The report generated by MTMHI following the January 2017 evaluation again indicated that the defendant was competent to stand trial and able to appreciate the nature and wrongfulness of his conduct.

"The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit a mentally incompetent person from being put to trial." *State v. Reid*, 213 S.W.3d 792, 808 (Tenn. 2006) (citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn. 2000)). That said, "[i]n Tennessee, a criminal defendant is presumed to be legally

-14-

competent." *State v. Johnson*, 401 S.W.3d 1, 17 (Tenn. 2013) (citing *State v. Reid*, 164 S.W.3d 286, 306-07 (Tenn. 2005); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)). As such, the defendant bears the burden of establishing his incompetence by a preponderance of the evidence in the trial court. *See Reid*, 164 S.W.3d at 306-08. To be deemed competent, a defendant must possess "the capacity to understand the nature and object of the proceedings against him [or her], to consult with counsel[,] and assist in preparing his [or her] defense." *Johnson*, 401 S.W.3d at 17 (quoting *Reid*, 164 S.W.3d at 306). "A defendant may prove his or her incompetency with evidence of the defendant's 'irrational behavior, his [or her] demeanor at trial, and any prior medical opinion on competence to stand trial.'" *Johnson*, 401 S.W.3d at 17 (citing *State v. Kiser*, 284 S.W.3d 227, 246 (Tenn. 2009) (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975))). The trial court's findings regarding the defendant's competence "are conclusive on appeal unless the evidence preponderates otherwise." *Oody*, 823 S.W.2d at 559.

In this case, all the mental health experts agreed that the defendant suffered from a mental illness, but every evaluator who spent more than a nominal amount of time with the defendant opined that the defendant was competent to stand trial. Only Doctor Schacht, who, by his own admission, was unable to complete a face-to-face evaluation with the defendant, expressed the opinion that the defendant was incompetent. Doctor Schacht had spent less than half an hour with the defendant, and he was unable to obtain any meaningful information during any of his encounters with the defendant. Under these circumstances, we cannot say that the evidence preponderates against the determination that the defendant was competent to stand trial.

## II. *Defendant's Statements*

Prior to trial, the defendant moved the trial court to suppress the statements he provided to the MCSO during all three interviews that took place on the day of the murder. The defendant claimed that his waiver of his constitutional rights was not valid because the final paragraph of the typewritten rights waiver form was "entirely in Spa[]nish and without an English language translation equivalent." The defendant also claimed that the form contained indecipherable signatures. Finally, the defendant asserted that his mental state and status at the time of the interviews prevented his executing a knowing, voluntary, and intelligent waiver of his constitutional rights.

At the hearing on the defendant's motion, Investigator Mason testified that after the defendant agreed to questioning, officers transported him to the sheriff's department. Investigator Mason informed the defendant that he was free to go but nevertheless provided the defendant with *Miranda* warnings before beginning "a basic interview of him, trying to find out where he was the day of the homicide, things like that, just nonthreatening questions." The defendant was provided with a rights waiver

form, at least part of which was in Spanish, and was asked to sign it after he indicated that he understood his rights and wished to waive them. Investigator Mason said that nothing in the defendant's behavior, speech, or demeanor suggested to Investigator Mason "that he was not understanding what was going on." At the conclusion of the interview, officers drove the defendant home. The video recording of the interview fully supports Investigator Mason's account.

Investigator Mason testified that after "some other things . . . came to light through the investigation," officers returned to the defendant's residence, and the defendant "willingly came back in again" to speak with the police. Before the second interview, Investigator Mason "affirmed that [the defendant] understood . . . that he was still covered under *Miranda*." The video recording of that interview confirms that Investigator Mason asked the defendant, "Do you remember those *Miranda* Rights I read to you?" and said, "Those still pertain, do you understand that?" The defendant indicated that he understood. Although Investigator Mason described the second interview as more intense than the first, the defendant provided no incriminating information during that interview. At the conclusion of that interview, the defendant "hung around until" Agent Legg arrived to interview him. Investigator Mason said that the defendant was not handcuffed or otherwise restricted in his movements during this period, and Investigator Mason reminded the defendant that he was free to leave.

Agent Legg testified that he did not provide fresh *Miranda* warnings before questioning the defendant but instead reminded the defendant of the earlier warnings provided by Investigator Mason. The defendant indicated that he understood those rights and that they remained applicable. Agent Legg also testified he told the defendant that he was not under arrest and was free to leave at any time. At the conclusion of the encounter, the defendant left the room to smoke. He was not arrested until later that same evening. The video recording of the third interview confirms Agent Legg's account of the encounter.

At the conclusion of the hearing, the trial court deemed the statements given during each of the three interviews to be voluntary. The trial court observed that the video recording of the first interview showed that "[t]here was a clear advice of rights, where it was in English" and that the defendant clearly indicated that he had heard the advice of rights before and fully understood them. The video recording also showed that Investigator Mason informed the defendant that he was not under arrest and was not required to provide a statement. Officers reminded the defendant of the earlier *Miranda* warnings during each of the subsequent interviews, and each time the defendant indicated that he understood his rights. The trial court also concluded that, because the defendant was not in custody at the time of any of the interviews, "there's no duty to warn him of his *Miranda* warnings." As to the voluntariness of the defendant's statements, the trial

-16-

court observed that neither party had presented proof of his age, education, or intelligence. The evidence presented, however, indicated that the defendant had at least some prior experience with the police, as evidenced by his admission that he had heard the advice of rights before. The court noted that none of the interviews was prolonged and that there was no evidence that the defendant had been deprived of food, sleep, or medical attention, or that he had been subjected to threats or physical abuse. No evidence suggested that the defendant was intoxicated or ill during any of the interviews. Based upon the totality of the circumstances, the court deemed the statements made during each of the interviews to be voluntary.

In this appeal, the defendant challenges each of the trial court's determinations.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or

not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)). Moreover, because of the extra protection afforded by the state constitution, "[f]or the relinquishment of rights to be effective, the defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights." *Thacker*, 164 S.W.3d at 249 (citing *Stephenson*, 878 S.W.2d at 544-45). Accordingly, "the totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension before a court can properly conclude that *Miranda* rights have been waived.'" *Blackstock*, 19 S.W.3d at 208 (quoting *Stephenson*, 878 S.W.2d at 545; *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

An accused "may knowingly and intelligently waive the right against self-incrimination only after being apprised of" the constitutional rights to remain silent and to counsel during interrogation. *Thacker*, 164 S.W.3d at 248. As with the voluntariness of a statement, the trial court "may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver." *Id.* (citing *Stephenson*, 878 S.W.2d at 545). "Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the *Miranda* rights are explained." *Blackstock*, 19 S.W.3d at 208.

As an initial matter, we agree with the State and the trial court that the defendant was not in custody during any of the three interviews conducted in this case. A suspect "is in custody so as to be entitled to the warnings required by *Miranda*" when "under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Dailey*, 273 S.W.3d 94, 102 (Tenn. 2009)

-18-

(quoting *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996), and citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). Relevant to the determination of this issue are:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Anderson*, 937 S.W.2d at 855.

Although officers transported the defendant to the sheriff's department, the accredited evidence in the record indicates that the defendant voluntarily agreed to questioning and that officers drove the defendant only because he had no other mode of transportation. Moreover, the defendant left the sheriff's department after the first interview and, although he remained at the police station between the second and third interviews, he only did so because he lacked transportation to return to his residence. The officers did not restrict his movement in any way during that time. The video recordings of each interview clearly indicate that the defendant was told he was not in custody and that he was free to leave at any time. Nothing in the officers' behavior in any way contradicted these statements. No more than two officers were in the interview room with the defendant at any given time, and all of the officers were in plain clothes. During each of the interviews, the officers' tone was light and casual. The defendant appeared relaxed during each interview. Under these circumstances, the trial court correctly concluded that the defendant was not in custody. Because "[b]y its own terms, *Miranda* applies to the questioning of an individual who has been 'taken into custody or otherwise deprived of his freedom by the authorities in any significant way,'" *Dailey*, 273 S.W.3d at 102 (quoting *Miranda*, 384 U.S. at 478), and because the defendant was not subjected to custodial interrogation, the officers were not required to provide him with *Miranda* warnings.

In addition, the defendant does not claim that the officers failed to provide him with *Miranda* warnings prior to questioning him but asserts that because the written

waiver of rights form was in Spanish, the State cannot sufficiently establish that he voluntarily waived his constitutional rights. We disagree. The video recording of the defendant's first interview clearly establishes that the officers orally provided the defendant with *Miranda* warnings and asked him to sign a written waiver. The officers pointed out that part of the form was in Spanish but indicated that the written waiver repeated the rights as provided orally. Although officers did not repeat the *Miranda* warnings before the second or third interview, they did remind the defendant of the earlier provision of rights and confirm that the defendant understood that the rights remained applicable. We agree with the trial court that a second *Miranda* warning was not required at that point. *See State v. Rogers*, 188 S.W.3d 593, 606 (Tenn. 2006) ("A valid waiver of *Miranda* rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights.").

Finally, the record establishes that the defendant voluntarily waived his constitutional rights. No evidence established the defendant's age, educational background, intelligence, or mental health status at the time of the interviews. The defendant presented no evidence at the suppression hearing relevant to the defendant's mental illness, and nothing suggested that the defendant's mental state played a role in his decision to waive his constitutional rights. The evidence indicated that the defendant had at least some prior experience with the police. The officers treated the defendant courteously throughout each of the interviews, offering him food and drink as well as the opportunity to go outside and smoke. None of the interviews was prolonged, and the defendant was not at any time subjected to threats or physical abuse. No evidence suggested that the defendant was intoxicated or ill during any of the interviews. Under these circumstances, the trial court did not err by denying the defendant's motion to suppress.

### III.    *Search Warrant*

Prior to trial, the defendant moved the trial court to suppress all the evidence seized pursuant to the search warrant issued for the defendant's residence, arguing that the warrant failed to adequately describe the premises to be searched and that the warrant did not establish a nexus between the evidence sought and the place to be searched.

At the suppression hearing, Detective Norwood testified that, while searching the victim's residence, officers discovered a "half jacketed" bullet in the wall of the victim's house. During interviews with the victim's family, officers learned that "a couple days before the shooting . . . there was an altercation between" the victim and the defendant and that the defendant "was very upset over them calling law enforcement"

following the altercation. Mr. McJunkin, the defendant's grandfather, told officers that the defendant had obtained a .30-06 rifle and "four half jacketed bullets from" Mr. McJunkin a few days before the shooting. Based upon this information, Detective Norwood prepared the warrant to search the defendant's residence. Detective Norwood said that officers were aware that the defendant lived in what had always been known as Plemmons Trailer Park and that the location was well-known to members of the sheriff's department. Detective Norwood said that she accessed 9-1-1 records to determine the street address and that the address was listed as the defendant's address on the booking sheet for the altercation that had occurred a few days prior to the murder. Detective Norwood acknowledged that a typographical error in the directions she provided to the address to be searched lists a cross street as "Parson Street" instead of "Carson Street." Other than the single typographical error, she said, the directions lead to the correct location at 1847 Highway 411, Lot 10. Detective Norwood said that she did not try to follow the mileage indications contained in the affidavit in support of the warrant because she intended the mileage to be approximate.

Detective Norwood testified that officers seized ammunition, a gun case, camouflage clothing, an ATV, and a .30-06 rifle "that was in the culvert in front of the house." She said that officers seized the ATV because the defendant told Detective Brannon that he had used the ATV to travel from his residence to the victim's residence, and Detective Brannon texted that information to her while they were executing the warrant.

Investigator Mason testified that it was he who explained to Detective Norwood where the defendant's mobile home was located within Plemmons Trailer Park. As to the location of the mobile home park, Investigator Mason echoed Detective Norwood's testimony that officers of the MCSO were very familiar with the location. He said that even if the signage for the trailer park did not indicate that it was called Plemmons Trailer Park, "it's just known that that's Plemmons Trailer Park."

The trial court described the directions contained in the affidavit and warrant as "on the sloppy side" and the listing of Carson Street in place of Parson Street as "less of a typographical error, and more of a just knowing the name of the street error." The court also found that the trailer park where the defendant lived did not have any signage indicating that it is Plemmons Trailer Park. The court ruled, however, that

> in spite of these defective directions, it is clear . . . from the
> testimony of both [Investigator] Mason and Officer Norwood,
> that these Officers identify the area at 1847 Highway 411 as
> Plemmons Trailer Park with or without a sign, and with or

without the mileage they all knew to where they were traveling.

The court noted that each of the officers "testified that they were familiar with the area, that they frequently referred to it, and that they respond to a number of calls to that particular area." The trial court also noted that, although the defendant claimed that the actual mileage to the trailer park differed from that listed in the warrant, the defendant presented no proof in support of his claims. Finally, the court held that case law established "that an [o]fficer's familiarity can cure a deficiency" in the description of the place to be searched and concluded that the description contained in the search warrant in this case was sufficient.

With regard to the nexus requirement, the trial court concluded that evidence that the defendant had obtained a rifle approximately one week before the shooting was "not too remote in time to a crime that allegedly occurred on October 13th." The court held that there was "sufficient nexus to show that a homicide occurred, and that there are reasonable grounds to suspect that the items involved in that homicide were in the possession of [the defendant] at the time of the search." The trial court observed that the State had seized items that fell outside the command to seize contained in the search warrant, and, to this end, the court suppressed a set of earplugs discovered at the scene. In contrast, the court declined to suppress the discovery of the ATV even though it fell outside the command to seize, finding that the ATV was in plain view when observed by Detective Norwood at the scene and that "information . . . was being communicated to" Detective Norwood that the defendant had "indicated that he traveled on his ATV." These factors, the court concluded, would have made "it readily apparent that that possibly was the ATV with which he traveled to and from the scene of the murder."

In this appeal, the defendant argues that the warrant affidavit contained insufficient grounds to establish probable cause to search and that the warrant failed to describe his residence with sufficient particularity. The State contends that the trial court properly denied the motion to suppress.

Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable, and any evidence discovered is subject to suppression. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constituional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth

-22-

Amendment—subject only to a few specifically established and well-delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997). "The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'" *Coolidge*, 403 U.S. at 455 (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958), and *McDonald v. United States*, 335 U.S. 451, 456 (1948)). "We are not dealing with formalities. The presence of a search warrant serves a high function." *McDonald*, 335 U.S. at 455.

To be valid, a "search warrant must comply with provisions of the United States Constitution, the Tennessee Constitution, and Tennessee statutory requirements." *State v. Davidson*, 509 S.W.3d 156, 182 (Tenn. 2016), *cert. denied*, 138 S. Ct. 105 (2017). To pass constitutional muster, a search warrant must be issued by a neutral and detached magistrate "upon probable cause," which, in the case of the federal constitution, must be "supported by Oath or affirmation," and must "particularly describ[e] the place to be searched[] and the persons or things to be seized." U.S. Const. amend. IV; *see also Davidson*, 509 S.W.3d at 182. In addition to the constitutional requirements, Code section 40-6-103 provides that "[a] search warrant can only be issued on probable cause, supported by affidavit, naming or describing the person, and particularly describing the property, and the place to be searched." T.C.A. § 40-6-103. Additionally, Tennessee Rule of Criminal Procedure 41 provides that "[a] warrant shall issue only on an affidavit or affidavits that are sworn before the magistrate and establish the grounds for issuing the warrant" and that the warrant must "identify the property or place to be searched" and "name or describe the property or person to be seized." Tenn. R. Crim. P. 41(c)(1); (3)(A).

### A. Particularity Requirement

The particularity requirement serves two purposes, it "protects the accused from being subjected to an unreasonable search and/or seizure" and "'prevent[s] the officer from searching the premises of one person under a warrant directed against those of another.'" *State v. Vanderford*, 980 S.W.2d 390, 404 (Tenn. Crim. App. 1997) (quoting *Squires v. State*, 525 S.W.2d 686, 690 (Tenn. Crim. App. 1975), and citing *Williams v. State*, 270 S.W.2d 184, 185 (Tenn. 1954)). The particularity requirement will be satisfied when the description "particularly points to a definitely ascertainable place so as to exclude all others[] and enables the officer to locate the place to be searched with reasonable certainty without leaving it to his discretion." *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993) (citing *Hatchett v. State*, 346 S.W.2d 258, 259 (Tenn. 1961); *State v. Cannon*, 634 S.W.2d 648, 650 (Tenn. Crim. App. 1982)). Inaccuracies in the address or directions provided will not "invalidate the warrant [when] the overall description of the

premises contained in the warrant enabled the police to locate the place to be searched with reasonable certainty." *Smith*, 868 S.W.2d at 572 (citing *State v. Wright*, 618 S.W.2d 310, 318 (Tenn. Crim. App. 1981)); *State v. Bostic*, 898 S.W.2d 242, 245 (Tenn. Crim. App. 1994) ("Discrepancies between the warrant's description with regard to distances to the place to be searched and the actual distance to the building searched do not invalidate the warrant if this test is satisfied." (citing *Hatchett*, 346 S.W.2d at 259; *Wright*, 618 S.W.2d at 310; *Feagins v. State*, 596 S.W.2d 108 (Tenn. Crim. App. 1979)). Moreover, when "a claim is made that an ambiguity" in the directions provided "will be reasonably perceived by an officer following the route provided in the warrant, the legal effect of such a possible ambiguity may be determined by considering the fact that the executing officer was the affiant and personally knew where the place to be searched was located." *Bostic*, 898 S.W.2d at 246 (citing 2 Wayne R. LaFave, Search and Seizure, § 4.5(a), at 210 (2d ed. 1987)).

As was the case in *Bostic*, "[t]he directions stated in the warrant were essentially accurate" apart from the misnaming of a single cross street. *See Bostic*, 898 S.W.2d at 246. Additionally, like Bostic, the defendant in this case "was named in the warrant and the affidavit stated that the defendant resided in, occupied or possessed the property to be searched." *See id.* Both Detective Norwood, who prepared the affidavit and executed the search warrant, and Investigator Mason, who participated in the execution of the search warrant, were familiar with the location of the mobile home park, and Investigator Mason knew specifically where the defendant lived. The warrant also contained the correct street address for the defendant as confirmed by the booking record from his arrest shortly before the murder. Under these circumstances, the cited deficiencies in the description of the location of the defendant's residence was cured by the officers' knowledge. Consequently, the trial court did not err by concluding that the warrant contained a sufficiently particular description of the place to be searched.

### B. Probable Cause

"Probable cause for the issuance of a search warrant exists when, 'given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place,' which in this instance was the defendant's residence." *State v. Aguilar*, 437 S.W.3d 889, 899 (Tenn. Crim. App. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence." *Smith*, 868 S.W.2d at 572. Because the probabilities involved in making the probable cause determination "are not technical" but are, instead, "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *State v. Tuttle*, 515 S.W.3d 282, 300 (Tenn. 2017) (quoting *Brinegar v.*

*United States*, 338 U.S. 160, 175 (1949)), the determinations "are extremely fact-dependent," *Tuttle*, 515 S.W.3d at 300 (quoting *State v. Bell*, 429 S.W.3d 524, 534 (Tenn. 2014)). Given the fact-driven nature of the probable cause determination, a reviewing court must "afford 'great deference' to a magistrate's determination that probable cause exists." *Tuttle*, 515 S.W.3d at 300 (citations omitted). Additionally, the reviewing court "may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant." *Id.* at 299 (citation omitted).

Here, the affidavit stated that officers were looking for a .30-06 rifle with a scope and the ammunition for such a rifle, that the defendant's grandfather reported having given the defendant such a gun approximately one week before the victim's murder, and that the defendant's girlfriend had seen him in possession of such a weapon at his residence in the days before the murder. Additionally, the defendant's grandfather reported having given the defendant four half-jacketed bullets on the same day that the defendant obtained the rifle; the bullet obtained from the wall of the victim's bedroom was a half-jacketed bullet. We agree with the trial court's conclusion that the timing of Ms. Harris' and Mr. McJunkin's observations were "not too remote in time to a crime that allegedly occurred on October 13th." Based upon this information, we conclude that the affidavit contained sufficient information to conclude that "'there is a fair probability that contraband or evidence of a crime will be found in a particular place,' which in this instance was the defendant's residence." *See Aguilar*, 437 S.W.3d at 899 (citation omitted). Accordingly, the trial court did not err by denying the defendant's motion to suppress the evidence obtained via the search warrant.

### IV.    Motion to Continue

Given that the defendant's competence to stand trial was a lingering issue, the trial court ordered that the defendant be evaluated for competency shortly before the trial. That evaluation took place at MTMHI in January 2017. Upon receiving news that the evaluation had been completed by MTMHI only two weeks before trial, the defendant moved the trial court to continue the trial to allow Doctor Schacht time to review the report and "work papers for the evaluation" prior to the trial. The defendant noted that although the trial was scheduled for February 13, 2017, he had not received all the evaluation records as of February 9, 2017.

The trial court conducted a hearing on the defendant's motion on the day of trial. Defense counsel claimed that he did not receive the necessary records relevant to the defendant's most recent competency evaluation until late Friday before the Monday trial. Counsel also stated that Doctor Schacht had told him that the records received from MTMHI did not contain documents "to indicate how" certain evaluations were made.

-25-

Finally, counsel stated that the defendant had again refused to see Doctor Schacht on the Sunday before trial. The trial court observed that the defendant's competence had been evaluated multiple times in the years between the murder and the scheduled trial and that each evaluation had ended with a conclusion that the defendant was competent to stand trial. The court concluded that the most recent evaluation contained no information that would warrant the court's revisiting its earlier determination that the defendant was competent. The court denied the defendant's motion to continue, and the case proceeded to trial that same day. The defendant challenges that ruling on appeal.

The decision to grant or deny "a continuance is a matter which addresses itself to the sound discretion of the trial judge." *Moorehead v. State*, 409 S.W.2d 357, 358 (Tenn. 1966) (citing *Bass v. State*, 231 S.W.2d 707 (Tenn. 1950)). An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied the defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995) (citing *State v. Wooden*, 658 S.W.2d 553, 558 (Tenn. Crim. App. 1983)). "The burden rests upon the party seeking the continuance to show how the court's action was prejudicial. The only test is whether the defendant has been deprived of his rights and an injustice done." *State v. Goodman*, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982) (citing *Baxter v. State*, 503 S.W.2d 226, 228 (Tenn. Crim. App. 1973)).

In our view, the defendant has failed to demonstrate that the trial court abused its discretion by denying his motion to continue. The issue of the defendant's competence had been litigated fully and fairly before the January 2017 evaluation, and that evaluation, which the trial court ordered as a precaution, did not suggest that the defendant was no longer competent. Although the defendant suggests that more time to examine the records of the last evaluation might have assisted Doctor Schacht in the preparation of his trial testimony, he has failed to point to anything in those records that established "that the defendant might have been prejudiced in some way by the refusal to grant a continuance." *Moorehead*, 409 S.W.2d at 358.

## V. Jury Instructions

The defendant next contends that the trial court erred by refusing to provide a jury instruction on the defense of insanity, claiming that the evidence presented supported the giving of the instruction. The State asserts that the trial court did not err, arguing that the evidence presented by the defendant did not fairly raise the issue.

The defendant's constitutional right to trial by jury, *see* U.S. Const. amend. VI; Tenn. Const. art. 1, § 6, encompasses the right to a correct and complete charge of the law, *see State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). To this end, the trial court has

-26-

a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see also* Tenn. R. Crim. P. 30.

"The question of whether the facts in a criminal case require the jury to be instructed regarding a particular defense is a mixed question of law and fact," which this court reviews "de novo, with no presumption of correctness." *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013) (citations omitted). A jury instruction may be classified as "prejudicially erroneous" only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Hodges*, 944 S.W.2d at 352 (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)).

Tennessee Code Annotated section 39-11-501 provides that "[i]t is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts." T.C.A. § 39-11-501(a). "The issue of the existence of an affirmative defense" such as insanity "may not be submitted to the jury unless it is fairly raised by the proof and notice has been provided" in accordance with the statute. T.C.A. § 39-11-204(d); *see State v. Parris*, 236 S.W.3d 173, 188 (Tenn. Crim. App. 2007) (stating that "[f]or a trial court to instruct a jury on an affirmative defense the Defendant need only 'fairly raise' the issue and provide notice of the affirmative defense" and concluding "that the trial court misapplied the burden of proof" when it stated "that the Defendant needed to prove his affirmative defense by a preponderance of the evidence for an instruction on the defense to be submitted to the jury"). To determine whether an affirmative defense has been "fairly raised" by the evidence, the trial court "must assess the defendant's position without ascertaining its truthfulness or the weight to which it might be entitled." *State v. Ivy*, 868 S.W.2d 724, 726 (Tenn. Crim. App. 1993) (citations omitted); *see also State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). Once submitted to the jury, "the defendant has the burden of proving the defense of insanity by clear and convincing evidence." T.C.A. § 39-11-501(a); *see also State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) ("[O]ur current insanity statute places the burden on the defendant to establish insanity by clear and convincing evidence, and not on the state to prove sanity.").

In support of his claim that he was insane at the time of the victim's murder, the defendant presented the testimony of Ms. Torbett, Ms. Harris, and Doctor Schacht. Ms. Torbett recalled a change in the defendant's behavior in the months prior to the murder that was marked by his speaking aloud to the television and expressing a belief that people on the television were communicating with him as well as violent episodes of self-harm and vandalism. Ms. Harris testified that, in the months prior to the

victim's murder, the defendant became withdrawn and suspicious. Doctor Schacht testified that the defendant had been diagnosed with schizophrenic form disorder and that he "suffered from a mental disorder whose most relevant symptom was delusional beliefs." Doctor Schacht opined, however, that, despite his mental disease, it "was very clear" that the defendant "understood the nature of his action." Doctor Schacht explained, "If wrongfulness is understood as knowledge that something is against the law, then from that perspective it's quite clear that [the defendant] did know that what he was doing was against the law." Doctor Schacht opined that the defendant's mental disease did not affect the defendant's ability to act intentionally or knowingly, saying, "[H]e knew what his action was." Doctor Schacht qualified that latter opinion, however, observing that the defendant "did not have a realistic or rational appreciation of the circumstances in which he was acting."

In light of Doctor Schacht's testimony that the defendant was able to appreciate the wrongfulness of his conduct and that the defendant presented no other proof to contradict that conclusion, the trial court declined to provide an instruction on the affirmative defense of insanity. In our view, the trial court's conclusion placed undue emphasis on Doctor Schacht's opinion. "The jury is not required to accept testimony of a psychiatrist on the issue of sanity to the exclusion of lay testimony or to the exclusion of evidence of the actions of the petitioner inconsistent with sanity." *Edwards v. State*, 540 S.W.2d 641, 647 (Tenn. 1976). Indeed, "the trier of fact may consider both lay and expert testimony"; "may look to the evidence of [the defendant's] actions and words before, at, and immediately after the commission of the offense"; and "may discount expert testimony which it finds to be in conflict with the facts of the case." *Holder*, 15 S.W.3d at 912 (citations omitted). That Doctor Schacht opined that the defendant could legally appreciate the wrongfulness of his actions did not require the jury to reach the same conclusion, and, in consequence, the trial court erred by relying on Doctor Schacht's testimony to reject the defendant's request for an instruction on insanity as an affirmative defense. We turn, then, to the evidence adduced at the trial, considered in the light most favorable to the existence of the defense, to determine whether the defense of insanity was fairly raised by the proof.

The uncontroverted evidence established that the defendant suffered from a severe mental disease at the time of the murder. The defendant's statement along with the testimony of Ms. Torbett and Ms. Harris established that the defendant was suffering from paranoid delusions. Although the evidence, most notably the defendant's statement and Doctor Schacht's testimony, suggested that the defendant knew that his conduct was legally wrong, it also established that the defendant did not believe that his conduct was morally wrong. Under these circumstances, the trial court erred by refusing to provide the insanity instruction. Our inquiry does not end here, however, because we must determine the harmful effect of the trial court's error.

-28-

Before we undertake our harmless error analysis, we must first determine the type of harmless error analysis applicable in this case. "[F]or the purpose of the harmless error analysis," our supreme court "has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error." *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (citing *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003); *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000); *State v. Harris*, 989 S.W.2d 307, 314-15 (Tenn. 1999)). "Not every erroneous jury instruction . . . rises to the level of constitutional error." *State v. Faulkner*, 154 S.W.3d 48, 60 (Tenn. 2005) (citing *Miller v. State*, 54 S.W.3d 743, 746 (Tenn. 2001)). Erroneous jury instructions that lessen the State's burden of proof have been deemed structural constitutional error not subject to any harmless error review. *See Faulkner*, 154 S.W.3d at 59 (citing *Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993)). "The misstatement of an element in jury instructions" as well as "[t]he failure to instruct the jury on a material element of an offense" are both "subject to constitutional harmless error analysis." *Faulkner*, 154 S.W.3d at 60.

Our supreme court has recognized that "[a]lthough the government is required to prove all essential elements of a crime beyond a reasonable doubt, *sanity is not an element of a crime*." *See Holder*, 15 S.W.3d at 911 (citing *Patterson v. New York*, 432 U.S. 197, 204-16 (1977)) (emphasis added); *see also State v. Holton*, 126 S.W.3d 845, 861 (Tenn. 2004) ("Proving insanity does not necessarily negate the element of premeditation."). Indeed, in its current iteration, Code section 39-11-501 places the burden upon the defendant to prove by clear and convincing evidence that he was insane at the time of the offense. *See* T.C.A. § 39-11-501(a) (1995). Because sanity is not an element of any crime and because the defendant bears the burden of proving insanity, it is our view that the erroneous failure to provide an instruction on the defense of insanity is non-constitutional error. *Cf. Patterson*, 432 U.S. at 210 ("Proof of the nonexistence of all affirmative defenses has never been constitutionally required . . . ."). Thus, the error should be "analyzed using the framework provided by" Tennessee Rule of Appellate Procedure 36(b). *See Rodriguez*, 254 S.W.3d at 371-72. Under this framework, the defendant must demonstrate "that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *Id.* (quoting Tenn. R. App. P. 36(b)).

As indicated, the evidence clearly established that the defendant suffered from a severe mental illness. When asked to opine whether the defendant was able to appreciate the wrongfulness of his conduct, Doctor Schacht indicated that the defendant was aware that his conduct was legally wrong but believed himself to be morally justified in killing the victim. However, "our law does not distinguish between legal and moral wrongfulness," *State v. Odle*, No. M2014-00349-CCA-R3-CD, slip op. at 6 (Tenn. Crim.

-29-

App., Nashville, Nov. 21, 2014) (finding that the jury reasonably rejected an insanity defense where experts "testified that appellant understood that his actions were *legally* wrong but not *morally* wrong); *see also State v. Hank Wise*, No. M2012-02520-CCA-R3-CD, slip op. at 20-22 (Tenn. Crim. App., Nashville, March 13, 2014), and it is enough that the defendant understand that his actions are wrong "in some form or another," *State v. Brian Val Kelley*, No. M2001-00461-CCA-R3-CD (Tenn. Crim. App., Nashville, May 7, 2002) (observing that Kelley had failed to prove his insanity by clear and convincing evidence when his "statements clearly indicated that he considered killing his daughter 'wrong,' in some form or *another*"). Both Ms. Torbett and Ms. Harris offered observations of the defendant's erratic behavior and evidence that the defendant suffered from paranoid delusions. Neither woman provided any testimony to suggest that the defendant "was unable to appreciate the nature or wrongfulness of" his actions. Most importantly, perhaps, the defendant himself repeatedly stated that he knew that killing the victim was legally wrong. The defendant told officers that he knew that he would likely serve "life in the penitentiary or several years for" the victim's murder and that he might even be subject to the death penalty. Additionally, the defendant's efforts to conceal his guilt indicate that he was aware of the wrongfulness of his conduct. He waited until the early hours of the morning and then traveled to the victim's home on backroads to avoid detection. After the murder, he collected the spent shell casing and took pains to hide both the shell casing and the murder weapon. Then, when initially questioned by police, the defendant gave no indication that it was he who had murdered the victim. In sum, the proof adduced as to the defendant's mental state, while sufficient to fairly raise the issue of insanity, did not rise to the level of clear and convincing evidence that the defendant was insane at the time of the offense. Additionally, we also note that the trial court did provide a jury instruction on the issue of diminished capacity. Although "diminished capacity is not a defense to a criminal charge, . . . evidence of diminished capacity is admissible to negate mens rea." *State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013) (citing *State v. Ferrell*, 277 S.W.3d 372, 379 (Tenn. 2009)). By convicting the defendant as charged, the jury clearly rejected the notion of the defendant's diminished capacity. Under these circumstances, the trial court's failure to provide a jury instruction on insanity was harmless.

## VI.    *Sufficiency*

Finally, the defendant challenges the sufficiency of the convicting evidence, essentially asking this court to declare the defendant not guilty by reason of insanity even though the jury was not instructed on that affirmative defense.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202 (2006). As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). Thus, when evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing."

*Bland*, 958 S.W.2d at 660.

Here, in a statement that can best be described as chilling, the defendant confessed that he killed the victim, claiming that he had done so because the victim had tried to poison him by placing an unknown substance into food that she served him more than 10 months prior to the murder and by placing "female hormones" into the pain pills that he obtained from her. The defendant admitted that he had thought about killing the victim for some time, that he retrieved his rifle from his grandfather expressly for the purpose of shooting the victim, and that he engaged in target practice with the rifle in the days before the shooting to ensure that the aim was true. Just before the murder, the defendant put gas into his ATV, gathered the rifle and a hunting knife, and then traveled to the victim's residence using back roads. He said that when he arrived at the residence, he went to the window of the room where he knew the victim would be sleeping and that he specifically aimed the gun to kill, saying, "[W]hen she raised up, dude, I just aimed it at her chest. I didn't even scope it or nothing, I just laid it like this to where I knew it was going to point blank her, and I fired that son of a b****." The defendant repeatedly emphasized that he felt no remorse for killing the victim and that he was fully aware that he would likely serve "life in the penitentiary or several years for this" and that he might even get the death penalty. In our view, the evidence overwhelmingly supports the jury verdict in this case.

As indicated, although the defendant presented evidence to fairly raise the affirmative defense of insanity, we easily conclude that he failed to establish the insanity defense by clear and convincing evidence as required by Code section 39-11-501(a). Thus, we decline the defendant's invitation to modify the verdict to one of not guilty by reason of insanity.

*VII.    Conclusion*

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE